## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br>United States Department of Justice<br>Antitrust Division, Litigation I Section<br>450 Fifth Street, N.W.<br>Suite 4100<br>Washington, DC 20530,<br><br>                 *Plaintiff*,<br>    v.<br><br>HUMANA INC.<br>500 West Main Street<br>Louisville, KY 40202<br><br>and<br><br>ARCADIAN MANAGEMENT<br>SERVICES, INC.<br>500 12th Street, Suite 340<br>Oakland, CA 94607,<br><br>                 *Defendants*. | CASE NO.:<br><br><br>JUDGE: |

## <u>COMPLAINT</u>

The United States of America ("United States"), acting under the direction of the

Attorney General of the United States, brings this civil action to enjoin Humana Inc. ("Humana")

from acquiring Arcadian Management Services, Inc. ("Arcadian").  The United States alleges as

follows:

1.	Unless enjoined, Humana's proposed acquisition of Arcadian will substantially

lessen competition in the sale of Medicare Advantage health insurance plans sold to Medicare-

eligible individuals ("the relevant product market") in forty-five counties and parishes in

Arizona, Arkansas, Louisiana, Oklahoma, and Texas ("the relevant geographic markets").

2.      A Medicare Advantage plan is a health insurance product sold by a private

company to Medicare-eligible individuals (collectively, "seniors") that replaces traditional

Medicare.  Congress created the Medicare Advantage program as a private-market alternative to

government-provided traditional Medicare.  In establishing the Medicare Advantage program,

Congress intended that vigorous competition among private Medicare Advantage insurers, such

as Humana and Arcadian, would lead those insurers to offer seniors a wider array of health

insurance choices, and richer and more affordable benefits than traditional Medicare does, and be

more responsive to seniors.  On August 24, 2011, Humana agreed to acquire Arcadian in a

transaction valued at approximately $150 million (the "transaction").

3.      Humana and Arcadian together account for 40 to 100 percent of the enrollment in

individual Medicare Advantage plans in each of the relevant geographic markets.  In these

markets, individual Medicare Advantage plans account for more than $700 million in annual

commerce.

4.      The proposed acquisition will significantly lessen competition among Medicare

Advantage plans and eliminate substantial head-to-head competition between Humana and

Arcadian in the provision of such plans in the relevant geographic markets.  The competition

between Humana and Arcadian in the relevant geographic markets has significantly benefited

thousands of seniors.  Humana's and Arcadian's plans in the relevant geographic markets offer

seniors significantly greater benefits than those available under traditional Medicare, likely

resulting in substantial healthcare cost savings for seniors selecting either of those companies'

plans.  The proposed acquisition will end that competition, eliminating the pressure that these

close competitors place on each other to maintain attractive benefits, low premiums, and high-quality healthcare.

5.      Because the proposed acquisition likely would substantially reduce competition in the sale of individual Medicare Advantage plans in the relevant geographic markets in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, the Court should permanently enjoin this transaction.

## I.   JURISDICTION, VENUE, AND INTERSTATE COMMERCE

6.      The United States brings this action pursuant to Section 15 of the Clayton Act, 15 U.S.C. § 25, to prevent and restrain Defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18.

7.      Humana and Arcadian are engaged in interstate commerce and in activities substantially affecting interstate commerce.  They sell insurance that covers enrollees when they travel across state lines; purchase health-care services from providers in various states; and receive payments from enrollees in various states.  Defendants also purchase health-care products and services, such as pharmaceuticals, in interstate commerce.

8.      The Court has subject-matter jurisdiction over this action pursuant to Section 15 of the Clayton Act, 15 U.S.C. § 25; and 28 U.S.C. §§ 1331, 1337(a), and 1345.

9.      Defendants have consented to personal jurisdiction in this District.  The Court also has personal jurisdiction over Defendants under Section 12 of the Clayton Act, 15 U.S.C. § 22.

10.     Defendants have consented to venue in this District.  Venue is also proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391.

## II.  THE DEFENDANTS AND THE PROPOSED TRANSACTION

11.     Humana is a corporation organized and existing under the laws of Delaware and has its principal place of business in Louisville, Kentucky.  A leading health insurer in the United States, Humana provides health insurance and other services to more than 17 million people nationwide.  In 2010, Humana reported revenues of approximately $33.6 billion.

12.     In the relevant geographic markets, Humana sells Medicare Advantage Private Fee-For-Service ("PFFS"), Health Maintenance Organization ("HMO"), and Preferred Provider Organization ("PPO") plans under the Humana Gold Choice, Humana Gold Plus, HumanaChoice, and Humana Reader's Digest Healthy Living Plan names.  Humana is one of the largest Medicare Advantage providers in the United States, with almost 1.8 million Medicare Advantage members.  Approximately 35,000 seniors are enrolled in individual Humana Medicare Advantage plans in the relevant geographic markets.

13.     Arcadian is a corporation organized and existing under the laws of Delaware and has its principal place of business in Oakland, California.  Arcadian sells Medicare HMO plans and focuses on secondary, non-urban, and underserved markets.  It has approximately 62,000 Medicare Advantage members in fifteen states.  In 2010, Arcadian had revenues of $622 million.

14.     Arcadian sells Medicare Advantage plans through its wholly-owned subsidiaries, Desert Canyon Community Care in Arizona; Arkansas Community Care and Texarkana Community Care in Arkansas; Arcadian Community Care in Louisiana; Arcadian Health Plan in Oklahoma; and Texas Community Care and Texarkana Community Care in Texas.  Over 14,700 people in the relevant geographic markets are enrolled in individual Arcadian Medicare Advantage plans.

15.     Humana and Arcadian each have well-established managed-care healthcare networks that they use to provide services to enrollees in the relevant geographic markets.  In addition, Humana and Arcadian each have an established brand and positive reputation in the relevant geographic markets.

## III.  THE MEDICARE ADVANTAGE INSURANCE MARKET

16.     The federal government provides and facilitates the provision of health insurance to millions of Medicare-eligible citizens through two types of programs: traditional Medicare and Medicare Advantage.  Under traditional Medicare, a beneficiary receives coverage for inpatient healthcare services in hospitals and other facilities under Medicare Part A and can elect to receive coverage for physician and outpatient healthcare services under Part B.  For Part A, the government generally charges no monthly premium if the beneficiary was in the workforce and paid Medicare taxes.  For Part B, the government deducts a monthly premium ($99.90 for most beneficiaries) from the beneficiary's Social Security checks.  In addition, the beneficiary must pay deductibles and/or coinsurance for doctor visits and hospital stays.  If a beneficiary wants to limit traditional Medicare's out-of-pocket costs, the beneficiary can purchase a Medicare Supplement plan for an additional monthly premium.  To receive prescription drug coverage, seniors enrolled in traditional Medicare can purchase a Medicare prescription drug plan (Medicare Part D) for an additional monthly premium.

17.     Medicare Advantage plans, unlike traditional Medicare, are offered by private insurance companies.  Medicare Advantage plans provide all of the medical insurance coverage that seniors receive under traditional Medicare and also usually limit out-of-pocket costs and include drug coverage.  These plans also generally provide benefits beyond what traditional Medicare provides, often including coverage for vision, hearing, dental, and wellness programs.

However, most Medicare Advantage plans have a more limited healthcare provider network than traditional Medicare.  Limited networks help Medicare Advantage insurers lower their costs and offer richer benefits than traditional Medicare.

18.     An insurance company that seeks to offer a Medicare Advantage plan in a county or parish must submit a bid to the Centers for Medicare and Medicaid Services ("CMS") for each Medicare Advantage plan that it intends to offer.  The bid must provide the insurer's anticipated costs per member to cover required Medicare Part A and Part B benefits.  CMS actuaries compare these costs, including an anticipated profit margin, to a Medicare benchmark that reflects, in part, the government's likely cost of covering the beneficiaries.  Through 2011, if the insurer's bid for Medicare benefits was lower than the benchmark, the Medicare program retained 25 percent of the savings and required that the insurer use the other 75 percent ("the rebate") to provide supplemental benefits or lower premiums.  Accordingly, a plan with lower projected costs would offer more benefits to seniors and be more attractive.  As of 2012, the rebate will vary based on performance as measured through CMS's Medicare star rating system, such that insurers will receive a greater fraction of the rebate the better their performance.  Therefore, Medicare Advantage plans compete for enrollment by lowering costs, lowering premiums, increasing benefits, and improving performance.

19.     Medicare Advantage enrollees can be either group or individual enrollees.  Group enrollees are generally retirees who enroll in a Medicare Advantage plan chosen by their former employer or another group.  Individual enrollees directly choose their Medicare Advantage plan from among the plans that CMS has approved for the county or parish in which they live.

## IV.  RELEVANT PRODUCT MARKET

20.     Most successful Medicare Advantage plans, including those in the relevant

geographic markets, offer substantially richer benefits at lower costs to enrollees than traditional

Medicare does with or without a Medicare Supplement or Medicare Prescription Drug Plan,

including lower copayments, lower coinsurance, caps on total yearly out-of-pocket costs,

prescription drug coverage, and supplemental benefits that traditional Medicare does not cover,

such as dental and vision coverage, and health club memberships.  Seniors enrolled in Medicare

Advantage plans also often value that they can receive all of these benefits through a single plan

and that Medicare Advantage plans manage care in ways that traditional Medicare does not.

21.     Consequently, a small but significant increase in Medicare Advantage plan

premiums or reduction in benefits is unlikely to cause a sufficient number of seniors to switch to

traditional Medicare such that the price increase or reduction in benefits would be unprofitable.

Accordingly, the relevant product market is no broader than the sale of individual Medicare

Advantage plans, which is a line of commerce under Section 7 of the Clayton Act,

15 U.S.C. § 18.

## V.  RELEVANT GEOGRAPHIC MARKETS AND MARKET CONCENTRATION

22.     Seniors may only enroll in Medicare Advantage plans that CMS has approved for

the county or parish in which they live.  Consequently, they could not turn to Medicare

Advantage plans offered outside the county or parish in which they live in response to a small

but significant increase in price in Medicare Advantage plans.

23.     The following forty-five counties and parishes are relevant geographic markets

within which to assess the likely effects of the transaction, and all are "sections of the country"

within the meaning of Section 7 of the Clayton Act: Mohave and Yavapai Counties in Arizona;

Columbia, Conway, Crawford, Franklin, Hempstead, Howard, Lafayette, Little River, Logan,

Miller, Nevada, Pope, Scott, Sebastian, Sevier, and Yell Counties in Arkansas; Allen,

Beauregard, Bienville, Bossier, Caddo, Calcasieu, Claiborne, De Soto, Jefferson Davis, Red

River, and Webster Parishes in Louisiana; Adair, Delaware, Haskell, Le Flore, McCurtain,

Ottawa, and Sequoyah Counties in Oklahoma; and Bowie, Cass, Deaf Smith, Gregg, Harrison,

Henderson, Potter, Randall, and Titus Counties in Texas.

24.     If consummated, the merger would give Humana market shares ranging from 40

to 100 percent in the forty-five relevant geographic markets.  *See* Appendix B.

25.     According to the Herfindahl-Hirschman Index ("HHI"), a measure of

concentration commonly relied on by the courts and antitrust agencies to measure market

concentration (defined and explained in Appendix A), the transaction would significantly

increase the market concentration for the relevant product in each of the relevant geographic

markets, almost all of which are already highly concentrated.  The increases in concentration

would range from 312 points in Pope County, Arkansas, to 4928 points in Sequoyah County,

Oklahoma, with all of the increases substantially higher than the 200 points *(see* Appendix B)

presumed likely to enhance market power in highly concentrated markets under the antitrust

agencies' *Horizontal Merger Guidelines*.  *See* U.S. Dep't of Justice & FTC*, Horizontal Merger

Guidelines* § 5.3 (2010).

26.     Defendants' market shares in the relevant geographic markets have generally

increased in recent years, as some competitors have exited these markets or stopped offering

certain competing products.

## VI.    ANTICOMPETITIVE EFFECTS

27.    The proposed transaction likely would substantially lessen competition in the sale of individual Medicare Advantage plans in the relevant geographic markets.  The transaction would end the substantial head-to-head competition between Humana and Arcadian to convince seniors to enroll in each company's Medicare Advantage plans in the relevant geographic markets.  In each market, Humana and Arcadian compete against each other by offering plans with frequently low or no premiums, reducing copayments, eliminating deductibles, lowering annual out-of-pocket maximum costs, managing care, improving drug coverage, offering desirable benefits, and making their provider networks more attractive to potential members.

## VII.    ABSENCE OF COUNTERVAILING FACTORS

28.    If Defendants complete the proposed transaction, the loss of this competition would likely result in higher premiums and reduced benefits for seniors enrolled in Medicare Advantage plans in the relevant geographic markets.

29.    Competition from existing Medicare Advantage plans and new entrants is unlikely to prevent anticompetitive effects in each relevant geographic market.  Entrants face substantial cost, reputation, and distribution disadvantages that will likely make them unable to prevent Humana from profitably raising premiums or reducing benefits in the relevant geographic markets.

## VIII.   VIOLATIONS ALLEGED

30.    The proposed transaction likely would substantially lessen competition in the sale of Medicare Advantage health insurance in each of the relevant geographic markets, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

31.     The proposed transaction would likely have the following effects in each relevant geographic market:

      a.     substantially lessening competition in the sale of Medicare Advantage insurance;

      b.     eliminating competition between Humana and Arcadian in the sale of Medicare Advantage insurance; and

      c.     increasing premiums or reducing benefits for Medicare Advantage insurance to less competitive levels than would prevail absent the acquisition.

## IX.     PRAYER FOR RELIEF

32.     The United States requests that this Court:

      a.     adjudge the proposed acquisition to violate Section 7 of the Clayton Act, 15 U.S.C. § 18;

      b.     preliminarily and permanently enjoin the defendants from carrying out the proposed transaction or from entering into or carrying out any other agreement, understanding, or plan, the effect of which would be to bring the Medicare Advantage businesses of Humana and Arcadian under common ownership or control;

      c.     award the United States its costs in this action; and

      d.     award the United States such other relief as the Court may deem just and proper.

Dated this 27th day of March 2012.

Respectfully submitted,

FOR PLAINTIFF UNITED STATES:


___/s/ Sharis A. Pozen_____
Sharis A. Pozen (DC Bar #446732)
Acting Assistant Attorney General for
Antitrust


___/s/ Leslie C. Overton_____
Leslie C. Overton (DC Bar #454493)
Deputy Assistant Attorney General


___/s/ Patricia A. Brink_____
Patricia A. Brink
Director of Civil Enforcement


___/s/ Joshua H. Soven_____
Joshua H. Soven (DC Bar #436633)
Chief, Litigation I Section


___/s/ Peter J. Mucchetti_____
Peter J. Mucchetti (DC Bar #463202)
Assistant Chief, Litigation I Section

___/s/ Adam Gitlin_____
Adam Gitlin*
Attorney
Litigation I Section
Antitrust Division
U.S. Department of Justice
450 Fifth Street, N.W., Suite 4100
Washington, DC  20530
Telephone: (202) 307-6456
Facsimile: (202) 305-1190
E-mail: adam.gitlin@usdoj.gov


Barry Creech (DC Bar #421070)
Barry Joyce
Edward D. Eliasberg, Jr. (DC Bar #199182)
Katrina Rouse


Attorneys for the United States


*Attorney of Record

APPENDIX A

**Herfindahl-Hirschman Index**

The term "HHI" means the Herfindahl-Hirschman Index, a commonly accepted measure of market concentration.  The HHI is calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers.  For example, for a market consisting of four firms with shares of 30, 30, 20, and 20 percent, the HHI is 2,600 ($30^2 + 30^2 + 20^2 + 20^2 = 2,600$).  The HHI takes into account the relative size distribution of the firms in a market.  It approaches zero when a market is occupied by a large number of firms of relatively equal size and reaches its maximum of 10,000 points when a market is controlled by a single firm.  The HHI increases both as the number of firms in the market decreases and as the disparity in size between those firms increases.

The agencies generally consider markets in which the HHI is between 1,500 and 2,500 points to be moderately concentrated, and consider markets in which the HHI is in excess of 2,500 points to be highly concentrated.  *See* U.S. Department of Justice & FTC, *Horizontal Merger Guidelines* § 5.3 (2010).  Transactions that increase the HHI by more than 200 points in highly concentrated markets are presumed likely to enhance market power under the *Horizontal Merger Guidelines* issued by the Department of Justice and the Federal Trade Commission. *See id.*

APPENDIX B

## Relevant Geographic Markets (as of March 2012)

| County | Post-Merger Share | HHI Post-Merger | Increase in HHI |
|---|---|---|---|
| Mohave, AZ | 82.3% | 6980 | 3386 |
| Yavapai, AZ | 40.8% | 5091 | 407 |
| Columbia, AR | 56.0% | 4732 | 1421 |
| Conway, AR | 55.0% | 3906 | 376 |
| Crawford, AR | 63.8% | 4514 | 1563 |
| Franklin, AR | 47.8% | 3539 | 549 |
| Hempstead, AR | 55.7% | 5064 | 1218 |
| Howard, AR | 58.1% | 4576 | 1681 |
| Lafayette, AR | 68.3% | 5668 | 1993 |
| Little River, AR | 82.1% | 7066 | 3292 |
| Logan, AR | 59.7% | 4263 | 1080 |
| Miller, AR | 73.8% | 5836 | 1931 |
| Nevada, AR | 58.9% | 5158 | 1139 |
| Pope, AR | 44.1% | 4055 | 312 |
| Scott, AR | 52.1% | 3545 | 984 |
| Sebastian, AR | 57.9% | 3882 | 1133 |
| Sevier, AR | 84.1% | 7326 | 3474 |
| Yell, AR | 40.3% | 3075 | 610 |
| Allen, LA | 78.5% | 6622 | 1310 |
| Beauregard, LA | 100.0% | 10000 | 4789 |
| Bienville, LA | 49.3% | 3721 | 1189 |
| Bossier, LA | 93.3% | 8748 | 848 |
| Caddo, LA | 92.7% | 8642 | 1626 |
| Calcasieu, LA | 100.0% | 10000 | 3217 |
| Claiborne, LA | 42.0% | 3523 | 535 |
| De Soto, LA | 100.0% | 10000 | 3648 |
| Jefferson Davis, LA | 88.7% | 8000 | 1746 |
| Red River, LA | 45.0% | 3803 | 926 |
| Webster, LA | 84.1% | 7323 | 1385 |
| Adair, OK | 60.1% | 5204 | 1799 |
| Delaware, OK | 100.0% | 10000 | 3887 |
| Haskell, OK | 58.6% | 4666 | 1688 |
| Le Flore, OK | 100.0% | 10000 | 4632 |
| McCurtain, OK | 80.6% | 6691 | 2325 |
| Ottawa, OK | 100.0% | 10000 | 1512 |
| Sequoyah, OK | 100.0% | 10000 | 4928 |
| Bowie, TX | 82.5% | 7019 | 3305 |
| Cass, TX | 81.3% | 6962 | 3285 |
| Deaf Smith, TX | 66.7% | 5556 | 1636 |
| Gregg, TX | 73.7% | 5783 | 2668 |
| Harrison, TX | 86.4% | 7652 | 3590 |
| Henderson, TX | 68.0% | 5197 | 2224 |
| Potter, TX | 72.6% | 5776 | 2197 |
| Randall, TX | 75.0% | 5928 | 1421 |
| Titus, TX | 75.8% | 6331 | 2198 |